[No. F050003. Fifth Dist. Nov. 2, 2006.]

In re D.D., a Person Coming Under the Juvenile Court Law.
STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, Plaintiff
and Respondent, v.
J.D., Defendant and Appellant.

## COUNSEL

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Michael H. Krausnick, County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

## Opinion

**CORNELL, J.**—J.D. is the father of D.D. He was 17 years old when a juvenile dependency petition was filed on behalf of D.D., his two-month-old child. The juvenile court did not appoint a guardian ad litem or an attorney for J.D. until the six-month review hearing. The juvenile court terminated J.D.'s reunification services 40 days later.

J.D. contends the juvenile court erred when it failed to appoint either a guardian ad litem or an attorney for him at the beginning of the proceedings. We agree and will reverse because J.D. is a *presumed* father who was a minor and, as such, he was entitled to more protection than he received in the juvenile court.

■ We publish this decision because we hold that a guardian ad litem must be appointed for a *presumed* father who is a minor, even though he personally does not appear.

### FACTUAL AND PROCEDURAL SUMMARY

On June 24, 2005, officers executed a search warrant at the home of the maternal grandparents, who were not present, and found rock cocaine, marijuana, pipes, and scales. J.D. (the child's father), S.W. (the child's mother), and D.D. were present at the time. The officers arrested S.W. after finding methamphetamine in her purse. The officers did not arrest J.D., even though he was on probation, because he was not in possession of any drugs or paraphernalia and was not in violation of probation. The officers also indicated that J.D. apparently had no permanent residence.

The officers called a social worker to the home. S.W. told the social worker she was not emancipated; J.D. claimed he was emancipated. J.D.'s mother was incarcerated at the time and the whereabouts of his father were unknown. The social worker was unable to verify that J.D. was emancipated and he was placed in protective custody. S.W. was placed in juvenile hall.

J.D.'s godmother told the social worker she would be willing to receive J.D. and D.D. into her home. The social worker responded that J.D. and D.D. were being placed in protective custody and told J.D.'s godmother

she would be contacted on Monday, June 27. There is no indication in the contact log that the social worker, or anyone else, followed up and contacted J.D.'s godmother on June 27.

On June 27 the social worker verified that J.D. was *not* emancipated. He was attending high school and was in his junior year. His probation officer told the social worker that J.D. was "doing very well" and had been placed with his mother. Although the probation officer was aware that J.D. was a minor and that his mother had been incarcerated the week before the warrant was executed, she took no steps to secure another custodial placement for J.D.

The social worker also contacted the home where J.D. had been placed. J.D.'s caregivers apparently spoke little English and their daughter interpreted for them. The daughter told the social worker that J.D. had left the home earlier that morning and had not returned. The social worker noted in her log that "[J.D]. had ran away."

On June 28, 2005, the Stanislaus County Community Services Agency (the Agency) filed a petition pursuant to Welfare and Institutions Code section 300[1] on behalf of two-month-old D.D. At that time J.D. was 17 years old and S.W. was 16. They were not married. The petition identified J.D. as D.D.'s presumed father. The petition also indicated that prior to the Agency's intervention, D.D. had resided with J.D. and S.W.

On June 28 J.D. called the Agency. When he was unable to reach the social worker, he left his phone number. The social worker stated in the detention report filed on June 28 that she "attempted to call [J.D.] multiple times with no success. [J.D.'s] whereabouts are currently unknown." She also indicated that both J.D. and S.W. had been the subject of several substantiated referrals to the Agency.

The detention hearing was held on June 29. S.W. and the maternal grandmother appeared; J.D. did not. When the juvenile court inquired whether J.D. had been notified of the hearing, the response was negative. The maternal grandmother stated that she and S.W. had been in contact with J.D. subsequent to D.D. being placed in protective custody, but she was under the impression that the hearing related to S.W., not D.D. The juvenile court

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

verified that J.D. was listed on the birth certificate as D.D.'s father and that J.D. himself was a minor. Prior to concluding the detention hearing, the juvenile court informed S.W.: "Because you are under the age of 18 I am going to require that you have an attorney. I'm also going to require that you have what's called a guardian ad litem who would make your legal decisions for you."

The juvenile court found that the Agency had exercised due diligence in attempting to locate and notify J.D. of the proceedings. The juvenile court concluded by stating, "If [J.D.] wants an attorney he'll need to let—bring that back before the next court date[;] that would be helpful."

On July 1 a notice of the jurisdictional hearing was sent to J.D., care of S.W.'s address. The notice indicated that a "Pre-Dispo/Jurisdiction" hearing would be held on July 20.

On July 5 the social worker called J.D. to get additional information for her report. J.D. indicated that he wanted to reunify with D.D. but believed that the chances the juvenile court would allow him to reunify were slim because he was a teenage parent. J.D. asked that visits be arranged with D.D. and the social worker promised he would be contacted and arrangements would be made for visitation.

During the July 5 telephone call, the social worker stated that she had "tried very hard to reach [J.D.]" prior to the detention hearing but had been unable to contact him until July 5. The social worker's log did not reflect any attempts to contact J.D. between June 27 and July 5.

Before concluding the telephone call on July 5, the social worker provided J.D. a telephone number of the person to call to arrange a visit with D.D. The social worker told J.D. that after his visit with the baby, the social worker would meet with him to discuss what services would be helpful and appropriate. The social worker also told J.D. to "come to court" and stated she gave him the date of the next court hearing.

On July 7 a combined jurisdictional/dispositional report was filed with the juvenile court. That report reiterated that both S.W. and J.D. were "minors whose parents have a long criminal history that includes a multitude of drug charges." The report indicated that J.D. had not run away from the foster placement. The foster mother had promised to take J.D. shopping for clothes

but then had left him stranded. The report also indicated that J.D.'s where-abouts were unknown and that he did not have a "responsible adult to live with at this time." The social worker also stated, however, that she found J.D. "to be very committed to his son and also willing to do what he needs to do to reunify with his baby."

The jurisdictional report disclosed that J.D. was receiving "SSI due to the fact that he is developmentally disabled."

The case plan for J.D. required that he submit to drug and alcohol assessments and attend high school until he received a diploma or GED. Visitation with D.D. was permitted at least once per month; the social worker was to meet with J.D. in person at least once per month; and the social worker was to refer J.D. to all appropriate community resources in order to complete the case plan.

At the combined jurisdictional and dispositional hearing on July 28, the juvenile court removed D.D. from the home pursuant to section 361, subdivision (c). Reunification services were ordered for *both* parents. J.D. was not present or represented at the hearing. Also on July 28, a notice pursuant to section 366.26 was mailed to J.D., again at the address provided to the juvenile court for S.W.

On August 1 the social worker mailed a letter to J.D. requesting that he contact her. J.D. called and a visit between J.D. and D.D. was scheduled for August 18. J.D. failed to show for the visit and the social worker called him. J.D. could not remember scheduling the visitation. The social worker expressed concern about J.D.'s "state of mind and his lack of any progress on his case plan."

There is no indication that the social worker ever reviewed the case plan with J.D.

In October probation officers arrived at J.D.'s home looking for S.W., who had run away from her foster care home. S.W. was found at J.D.'s home, placed under arrest, and taken to juvenile hall. While at juvenile hall, it was discovered that S.W. was pregnant.

J.D. also was arrested by probation officers when they found drugs in his possession. J.D. was placed in juvenile hall on October 10 and was still

incarcerated on December 15 when the social worker prepared her status review report. J.D. was due to be released in December 2005 for good behavior.

The status review report indicated that in the first three months of reunification services, J.D. had no contact with the social worker "other than requesting one visit that he no showed for." During the remaining reunification period, J.D. was incarcerated at juvenile hall.

The social worker stated in the report that J.D. had not initiated any services. The social worker recommended that the juvenile court find that reasonable services had been offered and that J.D. had not participated regularly or made substantive progress. She also recommended that the juvenile court set a section 366.26 hearing and proceed with a permanent plan of adoption.

J.D. appeared at the section 366.21 hearing on January 5, 2006. When asked by the juvenile court if he wanted an attorney to represent him, J.D. responded, "Yes, ma'am." The juvenile court appointed an attorney and guardian ad litem for J.D. because he was under the age of 18 and continued the hearing.

The section 366.21 report filed February 2, 2006, recommended terminating services to J.D. That report noted that while J.D. was in juvenile hall, no services were available to him. After his release from juvenile hall on December 25, 2005, J.D. was placed with his grandmother in Oakland. J.D. enrolled in a parenting program that commenced January 9, 2006. On January 13 the social worker mailed a letter to J.D. referring him to a program in Oakland for a drug assessment and counseling.

At the section 366.21 hearing held on February 14, 2006, the juvenile court followed the Agency's recommendation and terminated services for J.D., but continued services for S.W.

## DISCUSSION

J.D. contends the juvenile court erred when it failed to appoint a guardian ad litem and an attorney. The Agency argues that J.D. did not need a guardian ad litem, and he did not appear personally in the juvenile court after receiving adequate notice and request either a guardian ad litem or an attorney, so his appeal must fail.

### Requirement to Appoint Guardian ad Litem

█ Code of Civil Procedure section 372, subdivision (a) provides that in any proceeding in which a minor or an incompetent person is a party, "that

person *shall* appear . . . by a guardian ad litem appointed by the court in which the action or proceeding is pending, or by a judge thereof, in each case." (Italics added.) Code of Civil Procedure section 373 provides for the appointment of a guardian ad litem for a minor or incompetent person by the court on its own motion. (*Id.*, § 373, subds. (b) & (c).) When a minor is a party to an action, a guardian ad litem must be appointed for the minor as a matter of law. (*In re Sara D.* (2001) 87 Cal.App.4th 661, 667 [104 Cal.Rptr.2d 909].)

Clearly, the juvenile court understood its obligation to appoint a guardian ad litem for a minor who was a party to an action. On its own motion at the detention hearing, the juvenile court appointed both an attorney and a guardian ad litem for S.W. because she was under the age of 18. Yet, after establishing J.D. also was under the age of 18, qualified as D.D.'s *presumed* father, and had been placed in protective custody because he had no adult caretaker, the juvenile court did not appoint either a guardian ad litem or an attorney for J.D.

The Agency first argues that the juvenile court did not err in failing to appoint a guardian ad litem for J.D. because he did not need such protection. As support for this argument, the Agency relies on J.D.'s initial statements to the social worker that he was an emancipated minor and that J.D.'s aunt was his guardian.

The Agency's reliance on these statements is misplaced because within a matter of days after D.D. was placed in protective custody, the social worker knew these statements by J.D. were inaccurate. Both D.D. and J.D. were placed in protective custody on Friday, June 24. On Monday, June 27, the social worker verified that J.D. was not emancipated. Additionally, the social worker verified with J.D.'s probation officer that J.D. had been placed in the custody of his mother, not his aunt, but his mother subsequently had been incarcerated and no steps were taken to secure another adult guardian for J.D.

Next, the Agency, citing the case of *In re Emily R.* (2000) 80 Cal.App.4th 1344 [96 Cal.Rptr.2d 285], argues that the juvenile court had no duty to appoint a guardian ad litem because J.D. personally did not appear in court. In *Emily R.* this court held that a juvenile court had no duty to appoint a guardian ad litem for an *alleged* father, who was under age 18, who had not appeared in the dependency proceeding after receiving adequate notice. (*Id.* at pp. 1347, 1358.)

■ J.D.'s case is readily distinguishable from *Emily R.* as he is a *presumed* father, not simply an alleged father. A father's status in dependency proceedings is significant because it determines the extent that he is entitled to participate and the rights he has. (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209 [34 Cal.Rptr.3d 215].) Presumed father status ranks the highest. (*Ibid.*) Only a presumed father, and not a mere biological or alleged father, is entitled to reunification services and custody of a child. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451 [24 Cal.Rptr.2d 751, 862 P.2d 751].) Because J.D. was a minor, the juvenile court was required to appoint a guardian ad litem to assist him in securing his rights as a presumed father.

As of June 27 the Agency had knowledge that J.D., a minor in its protective custody, was not emancipated and had no adult caregiver or guardian. Also, J.D. had custody of D.D. at the time of detention by the Agency and J.D. had expressed a desire to remain in D.D.'s life. It was undisputed that J.D. was D.D.'s presumed father. The juvenile court was informed of these circumstances at the June 29 detention hearing, the same hearing at which a guardian ad litem and attorney were appointed for the teenage mother, S.W. Also, prior to the jurisdictional hearing, the Agency and the juvenile court were aware that J.D. was receiving SSI because he was developmentally disabled.

The emergency situation surrounding intervention on D.D.'s behalf dictates that the detention hearing could have proceeded without appointment of a guardian ad litem for J.D. But, clearly, J.D.'s minority, together with his status as a presumed father, should have triggered the appointment of a guardian ad litem under Code of Civil Procedure sections 372 and 373 before the jurisdictional hearing was held. This is so even if J.D. personally did not appear.

We also have no doubt that the very real problems that exist in this case because of no counsel being appointed for J.D., and a complete lack of adequate notice, would have been resolved by the appointment of a guardian ad litem.

Because J.D. was a minor and had neither a guardian ad litem nor an attorney to represent him, we conclude the proceedings were fundamentally unfair. Therefore, the jurisdictional findings and orders, and all subsequent orders and findings, must be vacated.

## DISPOSITION

All orders and findings issued subsequent to the detention hearing are vacated and the matter is remanded to the juvenile court. On remand, if J.D. is determined to be a minor, the juvenile court shall appoint a guardian ad litem for him. If J.D. is an adult, the juvenile court shall determine whether J.D.'s developmental disability warrants appointment of a guardian ad litem pursuant to Code of Civil Procedure section 372, subdivision (a). In either case, J.D. shall be entitled to appointed counsel and counsel shall be appointed unless J.D. affirmatively waives counsel.

Wiseman, Acting P. J., and Kane, J., concurred.