Filed 6/17/13  In re Miguel G. CA3

<u>**NOT**</u> <u>**TO**</u> <u>**BE**</u> <u>**PUBLISHED**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Butte)

----

| | |
|---|---|
| In re MIGUEL G. et al., Persons Coming Under the Juvenile Court Law. | C070896 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES, | (Super. Ct. Nos. J35538, J35539) |
| Plaintiff and Respondent, | |
| v. | |
| L.G., | |
| Defendant and Appellant. | |

L.G. (mother) appeals following the juvenile court's order terminating her reunification services and visitation as to minors Miguel G. and C.G.  (Welf. & Inst. Code, § 395.)[1]  She contends the court erred by failing to appoint a guardian ad litem for her sua sponte on the ground that she was incompetent.  Concluding this contention is forfeited, we shall affirm the orders.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2010, Butte County Department of Employment and Social Services (the Department) filed section 300 petitions as to Miguel G. (born in March 2006) and C.G. (born in July 2005), alleging that mother was arrested on drug-related charges and incarcerated in the county jail; the parental home was unsafe due to the presence of drugs (including 19 pounds of marijuana) and drug-related paraphernalia accessible to the minors; mother was not giving the minors prescribed medication; and father claimed he was unaware of the dangerous conditions.[2]

Because the minors were allegedly autistic and clients of Far Northern Regional Center, they were placed in a foster home licensed by that agency.[3]

At the contested jurisdictional hearing in December 2010, mother began screaming uncontrollably while conferring with counsel and had to be escorted from the courtroom; the juvenile court found that mother had voluntarily waived her right to appear at that hearing. The court found the allegations of the section 300 petitions true. At the Department's request, the court authorized two psychological evaluations of mother.

The disposition report recommended denying reunification services to mother under section 361.5, subdivision (b)(2) (mental disability). She was alleged to lack impulse control and to have lashed out violently towards others since her incarceration. She had refused to sign the release of information required to make referrals for psychological evaluations.

---

[2] Father's reunification services were terminated along with mother's. He was deported prior to the 12-month review hearing. He is not a party to this appeal.

[3] It turned out that only Miguel G. was truly autistic. C.G.'s behavioral problems disappeared once he was placed outside the parental home. On reevaluation of C.G., Far Northern Regional Center closed his case because he was ineligible for their services.

At the contested dispositional hearing in April 2011, however, the Department recommended services for mother because she had signed the necessary releases and had begun to participate in services. The juvenile court ordered a reunification plan for the parents and scheduled a six-month review for October 2011.

In July 2011, mother filed a *Marsden*[4] motion. The juvenile court heard the motion in August 2011.

Mother asserted among other things that counsel spoke to her only once briefly the day before the dispositional hearing, failed to subpoena three teachers who regularly came to mother's home because the minors had been kept out of school due to medical problems, failed to subpoena the maternal grandmother (who wanted placement of the minors), yelled at mother and told her she was "pathetic," failed to keep his promises to file a section 388 motion and a writ petition, failed to help her to obtain visitation with the minors, and failed to get her a copy of the Department's latest report.[5]

Mother's counsel replied in part that after he learned mother had not received visitation, he determined that she had not responded appropriately to questions on the evaluation form, the social worker had not received the letters she said she was writing to the minors, and she had not documented her charges against the Department. Counsel could not file a section 388 petition so long as mother failed to comply with her case plan.

---

[4] *People v. Marsden* (1970) 2 Cal.3d 118.

[5] The juvenile court interrupted mother to say that she would have to be removed from the courtroom if she did not stop yelling at the court. Mother replied, "I didn't feel I was yelling, but okay."

As to visitation, the court stated that the disposition report described mother as "impulsive, violent, and noncooperative," which made it too risky to allow visitation with the minors in jail. Mother replied that she had letters from two correctional officers saying the opposite. (No such letters appear in the record.)

The juvenile court denied the *Marsden* motion, finding that counsel had been representing mother properly and any deterioration in their relationship "has been occasioned solely by [mother's] attitude." The court then set a visitation and placement hearing in September 2011.

The Department's interim review report recommended terminating visitation as to mother, still incarcerated in the county jail pending trial on five felony charges, because it would be detrimental to the minors. Mother had not signed and returned a copy of her case plan agreement and was not complying with the visitation plan except by writing letters to the minors. She either failed to return assignments required by her case plan or returned them with the questions marked "[N/A]."[6] She was assigned to a single cell in the jail because she could not manage her behavior there.

The report attached a psychological evaluation of mother done in August 2011. The evaluator could not make a clear diagnosis of mental disorder. The evaluator noted, however, that mother refused to take responsibility for the actions that led to her incarceration. She had an extensive history of substance abuse and neglectful conduct toward her special-needs children. She relied heavily on respite care and tried to dictate the delivery of services to her on her own terms. She had a long history of legal and illegal prescription drug involvement and had been accused of " 'drug seeking' " behavior at a local emergency room. The large amount of marijuana found in her home was enough to suggest an unsafe environment for the minors, yet she denied, incredibly, that any amount at all was found. She was "at high risk to continue to engage in unsafe behaviors around her children until such time as she admits to her errors in judgment and

---

**6** The social worker opined that this conduct demonstrated "a severe lack of insight and/or honesty."

4

begins to take responsibility for change." "[H]er behaviors and justification of events paint a bleak picture" of her ability to benefit from reunification services.

The six-month status review report recommended maintaining the existing orders, but noted that the parents had made very little progress and continued to deny wrongdoing.

In November 2011, the juvenile court ordered that mother receive at least one noncontact visit in the jail if and only if she signed and returned the visitation guidelines.

At the contested six-month review hearing in December 2011, the juvenile court ordered the minors' placements and the parents' reunification services to continue, but set a 12-month review hearing the following month.

The 12-month status review report recommended terminating mother's reunification services and visitation. Mother was convicted of drug and child abuse charges in November 2011 and sentenced to four years eight months in county jail; she would not be released earlier than May 2013. She still had not signed and returned the visitation guidelines; though the social worker had sent them to her four times, she denied receiving them. She also had not returned assignments dealing with substance abuse and relapse prevention, claiming she had no drug problems and would have to answer the assignment questions " 'N/A.' " She had made no progress toward reunification and maintained complete denial of wrongdoing.

On February 2, 2012, the date set for the contested 12-month review hearing, mother's counsel, David Nelson, requested a continuance to discuss further with her "what this hearing is about and what evidence is relevant." Other counsel indicated that

5

they believed mother was not capable of assisting Nelson at that time.[7]  The juvenile court granted the requested continuance.

On February 8, 2012, mother filed a new *Marsden* motion.  Her supporting declaration, executed on a standard form, alleged every ground for the motion stated on the form.[8]  In addition, she wrote on the form that counsel refused to appeal from all appealable orders in the case and refused to help her to obtain visitation.

Before the beginning of the 12-month review hearing on February 23, 2012, the juvenile court heard the *Marsden* motion.  After mother spelled out her complaints, Nelson replied as follows:  He had tried to explain the procedures of dependency court, but communication between them was "very difficult."  She wanted to relitigate jurisdiction.[9]  She continually asked for a copy of a report which did not exist.  She complained that he had not filed a writ, but the only writ he had talked about was the one that would be filed if her reunification services were terminated, which had not happened yet.  He had talked about filing a section 388 petition as to visitation, but that proved unnecessary because the court calendared the matter on its own motion, as he had repeatedly tried to explain to mother.  He had litigated placement, the other main issue so far, every time they went to court.

---

[7]  County counsel also said mother had signed and returned a visitation agreement, but altered it by writing different terms on the face of the agreement.  Mother's "counteroffer" was unacceptable to the Department.

[8]  These include failing or refusing to confer and communicate with the declarant, to subpoena witnesses and other evidence favorable to the defense, to prepare or present an affirmative defense at the preliminary hearing (*sic*), to prepare or present critical testimony, physical evidence, and expert witnesses, to prepare and file critical motions, to impeach prosecution witnesses, and to present critical evidence at motion or writ hearings.

[9]  The juvenile court took judicial notice that Nelson was not representing mother when the jurisdictional hearing took place.

The juvenile court asked Nelson, "Would you briefly state what you've done to represent [mother]?" Mother interjected, "Nothing." The court said it would have to remove mother from the courtroom if she did not refrain from interrupting.

Nelson explained that he had met with mother three or four times in the jail and had answered her phone calls when he was in the office; if not, his secretaries did. He had spoken to her parents. He had done what he felt was appropriate to do on the case. But he would not relitigate the jurisdictional hearing because "[t]hat ship has sailed, and I have explained that to her a number of times." Nor would he contact a private investigator whose name she gave him, because that person was not his investigator and was not a part of the juvenile court system.

Mother said, "We never had a jurisdictional hearing." The court said, "Yes, we did." Mother said she was not there and was not told, "because the three teachers [who visited her home] should have been subpoenaed." The court said it would order that mother receive a transcript of the jurisdictional hearing.

Mother then said she had asked Nelson to subpoena the teachers "for moral character," "for visits." The court observed that mother had now had one visit in jail and there was no hearing set on visitation because no one was currently asking the court to terminate visits.[10]

Mother said, "They have just asked for termination of—what is that called, where I write essays and I turn them in monthly?" The court replied that the Department had requested termination of reunification services, the hearing was scheduled for March 1, 2012, and she could talk to Nelson about subpoenaing witnesses for that hearing.

---

[10] The court also noted that, as mother had said earlier in the hearing, it appeared that she would be released on home detention with an ankle bracelet, and future visitation might depend on how that worked out.

Mother then asserted again that Nelson failed to communicate with her or to do anything on the case. She also asserted that she had hired a private investigator on the juvenile case, not on her criminal case, and paid her $13,000, yet Nelson would not talk to the investigator.[11] The court replied to the latter point, "We've never seen that person, so that person has never provided any information, so I am not sure where that money went."

The court ruled, "[T]o the extent that there are conflicts between the statements of [mother] and her attorney, Mr. Nelson, made at this hearing, I believe Mr. Nelson, and disbelieve [mother], for the following reasons: [¶] She does not seem to have an understanding of what is [*sic*] transpired in this case. We are going to try to bring her up to speed with that by providing her with the copy of the jurisdiction hearing. She doesn't seem to understand the procedures in this matter; although I believe that Mr. Nelson has taken great pains, and her prior attorney great pains, to try and explain the procedures to her. This court has tried to take great pains to explain the procedures for her. [¶] I find that Mr. Nelson has properly represented [mother], and will continue to do so. I find that there has not been a breakdown in the relationship between Mr. Nelson and [mother] of sufficient kind as would make it impossible for him to properly represent her, and the motion for a *Marsden* is denied."

The contested 12-month review hearing was held on March 13, 2013. No transcript of the hearing has been furnished to us, but the minute orders show that mother and other witnesses testified. The juvenile court found that mother had not made progress toward reunification or complied with the visitation plan, and the minors were

---

[11] Mother claimed she and father had sold their SUVs for $5,000 each and they had raised $3,000 from a yard sale. The court did not explore whether mother's capacity to retain a private investigator was consistent with the claim of indigence that had allowed her to receive appointed counsel.

8

doing well in foster placement. The court therefore terminated mother's reunification services and visitation and calendared a section 366.26 hearing. The court advised mother of her right to file a writ petition to challenge these rulings.

Mother filed notice of appeal in propria persona, specifying the court's order denying her second *Marsden* motion and other earlier orders. She did not file a writ petition.

### DISCUSSION

Mother contends the juvenile court should have appointed a guardian ad litem for her because she was incompetent, and the court's failure to do so vitiated the entire proceedings, requiring remand and "a return to 'square one.' " (Cf. Code Civ. Proc., § 372; *In re James F.* (2008) 42 Cal.4th 901, 910-911; *In re M.F.* (2008) 161 Cal.App.4th 673, 678-682.) This contention is forfeited.

"In a dependency case, a parent who is mentally incompetent must appear by a guardian ad litem appointed by the court. (Code Civ. Proc., § 372; [citation].) The test is whether the parent has the capacity to understand the nature or consequences of the proceeding and to assist counsel in preparing the case." (*In re James F., supra*, 42 Cal.4th at p. 910.) If the juvenile court deems a party in a dependency proceeding incompetent, it has a duty to appoint a guardian ad litem for the party sua sponte. (*In re M.F., supra*, 161 Cal.App.4th at p. 679.)

In most instances, a parent who fails to file a writ petition after her reunification services have been terminated will forfeit any claim that could have been raised in that manner. (See *In re M.F., supra*, 161 Cal.App.4th at pp. 681-682.) Such forfeiture normally does not violate the parent's due process interests "because the dependency system has numerous safeguards built into it to prevent the erroneous termination of parental rights." (*Id.* at p. 682.) However, "[t]he failure to appoint a guardian ad litem in

9

an appropriate case goes to the very ability of the parent to meaningfully participate in the proceedings"; therefore, the forfeiture rule would not apply in such a case. (*Ibid.*)

Mother did not file a writ petition after her reunification services were terminated. She relies on *In re M.F.*, *supra*, 161 Cal.App.4th 673 as authority to avoid forfeiture, but her reliance is misplaced. There, the mother was entitled to a guardian ad litem as a matter of law because she was herself a minor. Since the court's failure to appoint a guardian ad litem patently violated due process, a finding of forfeiture was precluded. (Code Civ. Proc., § 372; *In re M.F.*, at pp. 678-679, 682.) Those considerations do not apply here.

First, mother's alleged incompetence is not a pure question of law, as in *In re M.F.*, but a mixed question of fact and law that was never raised by trial counsel. The forfeiture rule is routinely applied to appellate contentions that depend on the resolution of factual questions not raised below. (*Bogacki v. Board of Supervisors* (1971) 5 Cal.3d 771, 780; *Fretland v. County of Humboldt* (1999) 69 Cal.App.4th 1478, 1489.)

Second, the record simply does not show that mother was incapable of understanding the nature and consequences of the proceedings and of assisting counsel. (Cf. *In re James F.*, *supra*, 42 Cal.4th at p. 910.) She understood that the proceedings were about the removal of the minors from her custody and that the consequences could be permanent. She made many attempts (albeit sometimes misguided) to assist counsel. The fact that she also made unfounded *Marsden* motions based on misunderstandings does not distinguish her from many other parties in juvenile and criminal proceedings whose competence is not in doubt. Finally, the psychological evaluator did not find mother suffered from any disorder that would have prevented her from understanding and participating in the proceedings.

We also note that when the juvenile court denied mother's *Marsden* motions, it impliedly found that she was competent to participate in the proceedings. Thus, for

instance, the court ordered that mother receive a transcript of the jurisdictional hearing, which the court would not have done unless it thought she could comprehend it.

The fact that mother suffered from temperamental problems and engaged in self-defeating behavior did not compel a finding of incompetence as a matter of law.[12] Nor did her difficulty in grasping the intricacies of juvenile dependency procedure. If a parent who displayed any of these problems could not be deemed competent in a juvenile dependency proceeding, competence would be the rare exception, not the norm.

Because mother's newly alleged incompetence did not require the juvenile court to appoint a guardian ad litem on its own motion, her trial counsel never raised the issue, and  mother did not file a writ petition to challenge the termination of her reunification services, her contention is forfeited.

### DISPOSITION

The orders terminating mother's reunification services and visitation are affirmed.

                                    BUTZ            , J.

We concur:


            BLEASE            , Acting P. J.


            MAURO            , J.

---

[12]  Arguing to the contrary, mother asserts that "her uncontrollable screaming at the jurisdictional hearing effectively resulted in the forfeiture of her right to challenge the basis for dependency court intervention." This argument fails for multiple reasons. First, mother was represented by counsel at the jurisdictional hearing. Second, the record shows no basis for a successful challenge to jurisdiction. Third, mother suffered no prejudice from the court's exercise of jurisdiction because she received reunification services.

11